# Exhibit 8

VERSION: JANUARY 2010

GLOBAL MASTER SECURITIES LENDING AGREEMENT

78YORK00000775

# CONTENTS

**CLAUSE**                                                                      **PAGE**

1.    APPLICABILITY                                                              1

2.    INTERPRETATION                                                            1

3.    LOANS OF SECURITIES                                                        7

4.    DELIVERY                                                                   7

5.    COLLATERAL                                                                 8

6.    DISTRIBUTIONS AND CORPORATE ACTIONS                                       12

7.    RATES APPLICABLE TO LOANED SECURITIES AND CASH COLLATERAL                 14

8.    DELIVERY OF EQUIVALENT SECURITIES                                         14

9.    FAILURE TO DELIVER                                                        15

10.   EVENTS OF DEFAULT                                                         17

11.   CONSEQUENCES OF AN EVENT OF DEFAULT                                       18

12.   TAXES                                                                     22

13.   LENDER'S WARRANTIES                                                       23

14.   BORROWER'S WARRANTIES                                                     24

15.   INTEREST ON OUTSTANDING PAYMENTS                                          24

16.   TERMINATION OF THIS AGREEMENT                                             25

17.   SINGLE AGREEMENT                                                          25

18.   SEVERANCE                                                                 25

19.   SPECIFIC PERFORMANCE                                                      25

20.   NOTICES                                                                   25

21.   ASSIGNMENT                                                                26

22.   NON WAIVER                                                                26

23.   GOVERNING LAW AND JURISDICTION                                            26

78YORK00000776

| 24. | TIME | 27 |
|-----|------|-----|
| 25. | RECORDING | 27 |
| 26. | WAIVER OF IMMUNITY | 27 |
| 27. | MISCELLANEOUS | 27 |
|     | SCHEDULE | 30 |
|     | AGENCY ANNEX | 34 |
|     | ADDENDUM FOR POOLED PRINCIPAL AGENCY LOANS | 37 |

78YORK00000777

**AGREEMENT**

**BETWEEN:**

**Neoteric Limited (*Party A*)** registered address, 3rd Floor Queensgate House, 113 South Church Street, George Town, PO Box 10240, Grand Cayman, KY1 -1002, a company incorporated under the laws of the Cayman Islands, acting through one or more Designated Offices; and

**MDP5 Investment Trust (*Party B*)** registered address, 78 Yorktown St, Somerville, MA 02144, a company incorporated under the laws of the United States of America, acting through one or more Designated Offices.

## 1.    APPLICABILITY

1.1    From time to time the Parties acting through one or more Designated Offices may enter into transactions in which one party (*Lender*) will transfer to the other (*Borrower*) securities and financial instruments (*Securities*) against the transfer of Collateral (as defined in paragraph 2) with a simultaneous agreement by Borrower to transfer to Lender Securities equivalent to such Securities on a fixed date or on demand against the transfer to Borrower by Lender of assets equivalent to such Collateral.

1.2    Each such transaction shall be referred to in this Agreement as a *Loan* and shall be governed by the terms of this Agreement, including the supplemental terms and conditions contained in the Schedule and any Addenda or Annexes attached hereto, unless otherwise agreed in writing.  In the event of any inconsistency between the provisions of an Addendum or Annex and this Agreement, the provisions of such Addendum or Annex shall prevail unless the Parties otherwise agree.

1.3    Either Party may perform its obligations under this Agreement either directly or through a Nominee.

## 2.    INTERPRETATION

2.1    In this Agreement:

*Act of Insolvency* means in relation to either Party:

(a)    its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

(b)    its stating in writing that it is unable to pay its debts as they become due; or

(c)    its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, receiver or liquidator or analogous officer of it or any material part of its property; or

(d)    the presentation or filing of a petition in respect of it (other than by the other Party to this Agreement in respect of any obligation under this Agreement) in any court or before any agency alleging or for the bankruptcy, winding up or

insolvency of such Party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition not having been stayed or dismissed within 30 days of its filing (except in the case of a petition for winding-up or any analogous proceeding in respect of which no such 30 day period shall apply); or

(e)     the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such Party over all or any material part of such Party's property; or

(f)     the convening of any meeting of its creditors for the purpose of considering a voluntary arrangement as referred to in Section 3 of the Insolvency Act 1986 (or any analogous proceeding);

**Agency Annex** means the Annex to this Agreement published by the International Securities Lending Association and providing for Lender to act as agent for a third party in respect of one or more Loans;

**Alternative Collateral** means Collateral having a Market Value equal to the Collateral delivered pursuant to paragraph 5 and provided by way of substitution in accordance with the provisions of paragraph 5.3;

**Applicable Law** means the laws, rules and regulations (including double taxation conventions) of any relevant jurisdiction, including published practice of any government or other taxing authority in connection with such laws, rules and regulations;

**Automatic Early Termination** has the meaning given in paragraph 10.1(d);

**Base Currency** means the currency indicated in paragraph 2 of the Schedule;

**Business Day** means:

(a)     in relation to Delivery in respect of any Loan, a day other than a Saturday or a Sunday on which banks and securities markets are open for business generally in the place(s) where the relevant Securities, Equivalent Securities, Collateral or Equivalent Collateral are to be delivered;

(b)     in relation to any payments under this Agreement, a day other than a Saturday or a Sunday on which banks are open for business generally in the principal financial centre of the country of which the currency in which the payment is denominated is the official currency and, if different, in the place where any account designated by the Parties for the making or receipt of the payment is situated (or, in the case of a payment in euro, a day on which TARGET operates);

(c)     in relation to a notice or other communication served under this Agreement, any day other than a Saturday or a Sunday on which banks are open for business generally in the place designated for delivery in accordance with paragraph 3 of the Schedule; and

(d)     in any other case, a day other than a Saturday or a Sunday on which banks are open for business generally in each place stated in paragraph 6 of the Schedule;

**Buy-In** means any arrangement under which, in the event of a seller or transferor failing to deliver securities to the buyer or transferee, the buyer or transferee of such securities is entitled under the terms of such arrangement to buy or otherwise acquire securities equivalent to such securities and to recover the cost of so doing from the seller or transferor;

**Cash Collateral** means Collateral taking the form of a transfer of currency;

**Close of Business** means the time at which the relevant banks, securities settlement systems or depositaries close in the business centre in which payment is to be made or Securities or Collateral is to be delivered;

**Collateral** means such securities or financial instruments or transfers of currency as are referred to in the table set out under paragraph 1 of the Schedule as being acceptable or any combination thereof as agreed between the Parties in relation to any particular Loan and which are delivered by Borrower to Lender in accordance with this Agreement and shall include Alternative Collateral;

**Defaulting Party** has the meaning given in paragraph 10;

**Delivery** in relation to any Securities or Collateral or Equivalent Securities or Equivalent Collateral comprising Securities means:

(a)     in the case of Securities held by a Nominee or within a clearing or settlement system, the crediting of such Securities to an account of the Borrower or Lender, as the case may be, or as it shall direct, or,

(b)     in the case of Securities otherwise held, the delivery to Borrower or Lender, as the case may be, or as the transferee shall direct of the relevant instruments of transfer, or

(c)     by such other means as may be agreed,

and **deliver** shall be construed accordingly;

**Designated Office** means the branch or office of a Party which is specified as such in paragraph 6 of the Schedule or such other branch or office as may be agreed to in writing by the Parties;

**Equivalent** or **equivalent to** in relation to any Loaned Securities or Collateral (whether Cash Collateral or Non Cash Collateral) provided under this Agreement means Securities or other property, of an identical type, nominal value, description and amount to particular Loaned Securities or Collateral (as the case may be) so provided. If and to the extent that such Loaned Securities or Collateral (as the case may be) consists of Securities that are partly paid or have been converted, subdivided, consolidated, made the subject of a takeover, rights of pre emption, rights to receive securities or a

78YORK00000780

4

certificate which may at a future date be exchanged for Securities, the expression shall include such Securities or other assets to which Lender or Borrower (as the case may be) is entitled following the occurrence of the relevant event, and, if appropriate, the giving of the relevant notice in accordance with paragraph 6.7 and provided that Lender or Borrower (as the case may be) has paid to the other Party all and any sums due in respect thereof.  In the event that such Loaned Securities or Collateral (as the case may be) have been redeemed, are partly paid, are the subject of a capitalisation issue or are subject to an event similar to any of the foregoing events described in this paragraph, the expression shall have the following meanings:

(a)     in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(b)     in the case of a call on partly paid Securities, Securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, provided that Lender shall have paid Borrower, in respect of Loaned Securities, and Borrower shall have paid to Lender, in respect of Collateral, an amount of money equal to the sum due in respect of the call;

(c)     in the case of a capitalisation issue, Securities equivalent to the relevant Loaned Securities or Collateral, as the case may be, together with the securities allotted by way of bonus thereon;

(d)     in the case of any event similar to any of the foregoing events described in this paragraph, Securities equivalent to the Loaned Securities or the relevant Collateral, as the case may be, together with or replaced by a sum of money or Securities or other property equivalent to that received in respect of such Loaned Securities or Collateral, as the case may be, resulting from such event;

*Income* means any interest, dividends or other distributions of any kind whatsoever with respect to any Securities or Collateral;

*Income Record Date*, with respect to any Securities or Collateral, means the date by reference to which holders of such Securities or Collateral are identified as being entitled to payment of Income;

*Letter of Credit* means an irrevocable, non negotiable letter of credit in a form, and from a bank, acceptable to Lender;

*Loaned Securities* means Securities which are the subject of an outstanding Loan;

*Margin* has the meaning specified in paragraph 1 of the Schedule with reference to the table set out therein;

*Market Value* means:

(a)     in relation to the valuation of Securities, Equivalent Securities, Collateral or Equivalent Collateral (other than Cash Collateral or a Letter of Credit):

(i)    such price as is equal to the market quotation for the mid price of such Securities, Equivalent Securities, Collateral and/or Equivalent Collateral as derived from a reputable pricing information service reasonably chosen in good faith by Lender; or

(ii)    if unavailable the market value thereof as derived from the mid price or rate bid by a reputable dealer for the relevant instrument reasonably chosen in good faith by Lender,

in each case at Close of Business on the previous Business Day, or as specified in the Schedule, unless agreed otherwise or, at the option of either Party where in its reasonable opinion there has been an exceptional movement in the price of the asset in question since such time, the latest available price, plus (in each case):

(iii)    the aggregate amount of Income which has accrued but not yet been paid in respect of the Securities, Equivalent Securities, Collateral or Equivalent Collateral concerned to the extent not included in such price,

provided that the price of Securities, Equivalent Securities, Collateral or Equivalent Collateral that are suspended or that cannot legally be transferred or that are transferred or required to be transferred to a government, trustee or third party (whether by reason of nationalisation, expropriation or otherwise) shall for all purposes be a commercially reasonable price agreed between the Parties, or absent agreement, be a price provided by a third party dealer agreed between the Parties, or if the Parties do not agree a third party dealer then a price based on quotations provided by the Reference Dealers.  If more than three quotations are provided, the Market Value will be the arithmetic mean of the prices, without regard to the quotations having the highest and lowest prices.  If three quotations are provided, the Market Value will be the quotation remaining after disregarding the highest and lowest quotations.   For this purpose, if more than one quotation has the same highest or lowest price, then one of such quotations shall be disregarded.  If fewer than three quotations are provided, the Market Value of the relevant Securities, Equivalent Securities, Collateral or Equivalent Collateral shall be determined by the Party making the determination of Market Value acting reasonably;

(b)    in relation to a Letter of Credit the face or stated amount of such Letter of Credit; and

(c)    in relation to Cash Collateral the amount of the currency concerned;

**Nominee** means a nominee or agent appointed by either Party to accept delivery of, hold or deliver Securities, Equivalent Securities, Collateral and/or Equivalent Collateral or to receive or make payments on its behalf;

**Non Cash Collateral** means Collateral other than Cash Collateral;

**Non Defaulting Party** has the meaning given in paragraph 10;

6

*Notification Time* means the time specified in paragraph 1.5 of the Schedule;

*Parties* means Lender and Borrower and *Party* shall be construed accordingly;

*Posted Collateral* has the meaning given in paragraph 5.4;

*Reference Dealers* means, in relation to any Securities, Equivalent Securities, Collateral or Equivalent Collateral, four leading dealers in the relevant securities selected by the Party making the determination of Market Value in good faith;

*Required Collateral Value* has the meaning given in paragraph 5.4;

*Sales Tax* means value added tax and any other Tax of a similar nature (including, without limitation, any sales tax of any relevant jurisdiction);

*Settlement Date* means the date upon which Securities are due to be transferred to Borrower in accordance with this Agreement;

*Stamp Tax* means any stamp, transfer, registration, documentation or similar Tax; and

*Tax* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) imposed by any government or other taxing authority in respect of any transaction effected pursuant to or contemplated by, or any payment under or in respect of, this Agreement.

2.2    **Headings**

All headings appear for convenience only and shall not affect the interpretation of this Agreement.

2.3    **Market terminology**

Notwithstanding the use of expressions such as "borrow", "lend", "Collateral", "Margin" etc. which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, title to Securities "borrowed" or "lent" and "Collateral" provided in accordance with this Agreement shall pass from one Party to another as provided for in this Agreement, the Party obtaining such title being obliged to deliver Equivalent Securities or Equivalent Collateral as the case may be.

2.4    **Currency conversions**

Subject to paragraph 11, for the purposes of determining any prices, sums or values (including Market Value and Required Collateral Value) prices, sums or values stated in currencies other than the Base Currency shall be converted into the Base Currency at the latest available spot rate of exchange quoted by a bank selected by Lender (or if an Event of Default has occurred in relation to Lender, by Borrower) in the London inter bank market for the purchase of the Base Currency with the currency concerned on the day on which the calculation is to be made or, if that day is not a Business Day, the spot rate of exchange quoted at Close of Business on the immediately preceding Business Day on which such a quotation was available.

2.5    The Parties confirm that introduction of and/or substitution (in place of an existing currency) of a new currency as the lawful currency of a country shall not have the effect of altering, or discharging, or excusing performance under, any term of the Agreement or any Loan thereunder, nor give a Party the right unilaterally to alter or terminate the Agreement or any Loan thereunder.  Securities will for the purposes of this Agreement be regarded as equivalent to other securities notwithstanding that as a result of such introduction and/or substitution those securities have been redenominated into the new currency or the nominal value of the securities has changed in connection with such redenomination.

2.6    **Modifications etc. to legislation**

Any reference in this Agreement to an act, regulation or other legislation shall include a reference to any statutory modification or re enactment thereof for the time being in force.

3.    **LOANS OF SECURITIES**

Lender will lend Securities to Borrower, and Borrower will borrow Securities from Lender in accordance with the terms and conditions of this Agreement.  The terms of each Loan shall be agreed prior to the commencement of the relevant Loan either orally or in writing (including any agreed form of electronic communication) and confirmed in such form and on such basis as shall be agreed between the Parties.  Unless otherwise agreed, any confirmation produced by a Party shall not supersede or prevail over the prior oral, written or electronic communication (as the case may be).

4.    **DELIVERY**

4.1    **Delivery of Securities on commencement of Loan**

Lender shall procure the Delivery of Securities to Borrower or deliver such Securities in accordance with this Agreement and the terms of the relevant Loan.

4.2    **Requirements to effect Delivery**

The Parties shall execute and deliver all necessary documents and give all necessary instructions to procure that all right, title and interest in:

(a)    any Securities borrowed pursuant to paragraph 3;

(b)    any Equivalent Securities delivered pursuant to paragraph 8;

(c)    any Collateral delivered pursuant to paragraph 5;

(d)    any Equivalent Collateral delivered pursuant to paragraphs 5 or 8;

shall pass from one Party to the other subject to the terms and conditions set out in this Agreement, on delivery of the same in accordance with this Agreement with full title guarantee, free from all liens, charges and encumbrances.  In the case of Securities, Collateral, Equivalent Securities or Equivalent Collateral title to which is registered in a

computer based system which provides for the recording and transfer of title to the same by way of book entries, delivery and transfer of title shall take place in accordance with the rules and procedures of such system as in force from time to time. The Party acquiring such right, title and interest shall have no obligation to return or deliver any of the assets so acquired but, in so far as any Securities are borrowed by or any Collateral is delivered to such Party, such Party shall be obliged, subject to the terms of this Agreement, to deliver Equivalent Securities or Equivalent Collateral as appropriate.

4.3     **Deliveries to be simultaneous unless otherwise agreed**

Where under the terms of this Agreement a Party is not obliged to make a Delivery unless simultaneously a Delivery is made to it, subject to and without prejudice to its rights under paragraph 8.6, such Party may from time to time in accordance with market practice and in recognition of the practical difficulties in arranging simultaneous delivery of Securities, Collateral and cash transfers, waive its right under this Agreement in respect of simultaneous delivery and/or payment provided that no such waiver (whether by course of conduct or otherwise) in respect of one transaction shall bind it in respect of any other transaction.

4.4     **Deliveries of Income**

In respect of Income being paid in relation to any Loaned Securities or Collateral, Borrower (in the case of Income being paid in respect of Loaned Securities) and Lender (in the case of Income being paid in respect of Collateral) shall provide to the other Party, as the case may be, any endorsements or assignments as shall be customary and appropriate to effect, in accordance with paragraph 6, the payment or delivery of money or property in respect of such Income to Lender, irrespective of whether Borrower received such endorsements or assignments in respect of any Loaned Securities, or to Borrower, irrespective of whether Lender received such endorsements or assignments in respect of any Collateral.

5.      **COLLATERAL**

5.1     **Delivery of Collateral on commencement of Loan**

Subject to the other provisions of this paragraph 5, Borrower undertakes to deliver to or deposit with Lender (or in accordance with Lender's instructions) Collateral simultaneously with Delivery of the Securities to which the Loan relates and in any event no later than Close of Business on the Settlement Date.

5.2     **Deliveries through securities settlement systems generating automatic payments**

Unless otherwise agreed between the Parties, where any Securities, Equivalent Securities, Collateral or Equivalent Collateral (in the form of securities) are transferred through a book entry transfer or settlement system which automatically generates a payment or delivery, or obligation to pay or deliver, against the transfer of such securities, then:

(a)     such automatically generated payment, delivery or obligation shall be treated as a payment or delivery by the transferee to the transferor, and except to the

78YORK00000785

extent that it is applied to discharge an obligation of the transferee to effect payment or delivery, such payment or delivery, or obligation to pay or deliver, shall be deemed to be a transfer of Collateral or delivery of Equivalent Collateral, as the case may be, made by the transferee until such time as the Collateral or Equivalent Collateral is substituted with other Collateral or Equivalent Collateral if an obligation to deliver other Collateral or deliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral; and

(b)    the Party receiving such substituted Collateral or Equivalent Collateral, or if no obligation to deliver other Collateral or redeliver Equivalent Collateral existed immediately prior to the transfer of Securities, Equivalent Securities, Collateral or Equivalent Collateral, the Party receiving the deemed transfer of Collateral or Delivery of Equivalent Collateral, as the case may be, shall cause to be made to the other Party for value the same day either, where such transfer is a payment, an irrevocable payment in the amount of such transfer or, where such transfer is a Delivery, an irrevocable Delivery of securities (or other property, as the case may be) equivalent to such property.

5.3    **Substitutions of Collateral**

Borrower may from time to time call for the repayment of Cash Collateral or the Delivery of Collateral equivalent to any Collateral delivered to Lender prior to the date on which the same would otherwise have been repayable or deliverable provided that at or prior to the time of such repayment or Delivery Borrower shall have delivered Alternative Collateral acceptable to Lender and Borrower is in compliance with paragraph 5.4 or paragraph 5.5, as applicable.

5.4    **Marking to Market of Collateral during the currency of a Loan on aggregated basis**

Unless paragraph 1.3 of the Schedule indicates that paragraph 5.5 shall apply in lieu of this paragraph 5.4, or unless otherwise agreed between the Parties:

(a)    the aggregate Market Value of the Collateral delivered to or deposited with Lender (excluding any Equivalent Collateral repaid or delivered under paragraphs 5.4(b) or 5.5(b) (as the case may be)) (**Posted Collateral**) in respect of all Loans outstanding under this Agreement shall equal the aggregate of the Market Value of Securities equivalent to the Loaned Securities and the applicable Margin (the **Required Collateral Value**) in respect of such Loans;

(b)    if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement together with: (i) all amounts due and payable by the Lender under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral exceeds the aggregate of the Required Collateral Values in respect of such Loans together with: (i) all amounts due and payable by the Borrower under this Agreement but which are unpaid; and (ii) if agreed between the parties and if

78YORK00000786

the Income Record Date has occurred in respect of any securities equivalent to Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Lender shall (on demand) repay and/or deliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess;

(c)    if at any time on any Business Day the aggregate Market Value of the Posted Collateral in respect of all Loans outstanding under this Agreement together with: (i) all amounts due and payable by the Lender under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral falls below the aggregate of Required Collateral Values in respect of all such Loans together with: (i) all amounts due and payable by the Borrower under this Agreement but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of Securities equivalent to any Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency;

(d)    where a Party acts as both Lender and Borrower under this Agreement, the provisions of paragraphs 5.4(b) and 5.4(c) shall apply separately (and without duplication) in respect of Loans entered into by that Party as Lender and Loans entered into by that Party as Borrower.

**5.5    Marking to Market of Collateral during the currency of a Loan on a Loan by Loan basis**

If paragraph 1.3 of the Schedule indicates this paragraph 5.5 shall apply in lieu of paragraph 5.4, the Posted Collateral in respect of any Loan shall bear from day to day and at any time the same proportion to the Market Value of Securities equivalent to the Loaned Securities as the Posted Collateral bore at the commencement of such Loan. Accordingly:

(a)    the Market Value of the Posted Collateral to be delivered or deposited while the Loan continues shall be equal to the Required Collateral Value;

(b)    if at any time on any Business Day the Market Value of the Posted Collateral in respect of any Loan together with: (i) all amounts due and payable by the Lender in respect of that Loan but which are unpaid; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral exceeds the Required Collateral Value in respect of such Loan together with: (i) all amounts due and payable by the Borrower in respect of that Loan; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of Securities equivalent to any Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Lender shall (on demand) repay and/or deliver, as the case may be, to Borrower such Equivalent Collateral as will eliminate the excess; and

(c)    if at any time on any Business Day the Market Value of the Posted Collateral together with: (i) all amounts due any payable by the Lender in respect of that Loan; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of any Non-Cash Collateral, the amount or Market Value of Income payable in respect of such Non-Cash Collateral falls below the Required Collateral Value together with: (i) all amounts due and payable by the Borrower in respect of that Loan; and (ii) if agreed between the parties and if the Income Record Date has occurred in respect of Securities equivalent to any Loaned Securities, the amount or Market Value of Income payable in respect of such Equivalent Securities, Borrower shall (on demand) provide such further Collateral to Lender as will eliminate the deficiency.

5.6    **Requirements to deliver excess Collateral**

Where paragraph 5.4 applies, unless paragraph 1.4 of the Schedule indicates that this paragraph 5.6 does not apply, if a Party (the *first Party*) would, but for this paragraph 5.6, be required under paragraph 5.4 to provide further Collateral or deliver Equivalent Collateral in circumstances where the other Party (the *second Party*) would, but for this paragraph 5.6, also be required to or provide Collateral or deliver Equivalent Collateral under paragraph 5.4, then the Market Value of the Collateral or Equivalent Collateral deliverable by the first Party (*X*) shall be set off against the Market Value of the Collateral or Equivalent Collateral deliverable by the second Party (*Y*) and the only obligation of the Parties under paragraph 5.4 shall be, where X exceeds Y, an obligation of the first Party, or where Y exceeds X, an obligation of the second Party to repay and/or (as the case may be) deliver Equivalent Collateral or to deliver further Collateral having a Market Value equal to the difference between X and Y.

5.7    Where Equivalent Collateral is repaid or delivered (as the case may be) or further Collateral is provided by a Party under paragraph 5.6, the Parties shall agree to which Loan or Loans such repayment, delivery or further provision is to be attributed and failing agreement it shall be attributed, as determined by the Party making such repayment, delivery or further provision to the earliest outstanding Loan and, in the case of a repayment or delivery up to the point at which the Market Value of Collateral in respect of such Loan equals the Required Collateral Value in respect of such Loan, and then to the next earliest outstanding Loan up to the similar point and so on.

5.8    **Timing of repayments of excess Collateral or deliveries of further Collateral**

Where any Equivalent Collateral falls to be repaid or delivered (as the case may be) or further Collateral is to be provided under this paragraph 5, unless otherwise provided or agreed between the Parties, if the relevant demand is received by the Notification Time specified in paragraph 1.5 of the Schedule, then the delivery shall be made not later than the Close of Business on the same Business Day; if a demand is received after the Notification Time, then the relevant delivery shall be made not later than the Close of Business on the next Business Day after the date such demand is received.

5.9    **Substitutions and extensions of Letters of Credit**

Where Collateral is a Letter of Credit, Lender may by notice to Borrower require that Borrower, on the third Business Day following the date of delivery of such notice (or by

such other time as the Parties may agree), substitute Collateral consisting of cash or other Collateral acceptable to Lender for the Letter of Credit. Prior to the expiration of any Letter of Credit supporting Borrower's obligations hereunder, Borrower shall, no later than 10.30 a.m. UK time on the second Business Day prior to the date such Letter of Credit expires (or by such other time as the Parties may agree), obtain an extension of the expiration of such Letter of Credit or replace such Letter of Credit by providing Lender with a substitute Letter of Credit in an amount at least equal to the amount of the Letter of Credit for which it is substituted.

**6.    DISTRIBUTIONS AND CORPORATE ACTIONS**

6.1    In this paragraph 6, references to an amount of Income received by any Party in respect of any Loaned Securities or Non Cash Collateral shall be to an amount received from the issuer after any applicable withholding or deduction for or on account of Tax.

6.2    **Manufactured payments in respect of Loaned Securities**

Where the term of a Loan extends over an Income Record Date in respect of any Loaned Securities, Borrower shall, on the date such Income is paid by the issuer, or on such other date as the Parties may from time to time agree, pay or deliver to Lender such sum of money or property as is agreed between the Parties or, failing such agreement, a sum of money or property equivalent to (and in the same currency as) the type and amount of such Income that would be received by Lender in respect of such Loaned Securities assuming such Securities were not loaned to Borrower and were retained by Lender on the Income Record Date.

6.3    **Manufactured payments in respect of Non-Cash Collateral**

Where Non Cash Collateral is delivered by Borrower to Lender and an Income Record Date in respect of such Non Cash Collateral occurs before Equivalent Collateral is delivered by Lender to Borrower, Lender shall on the date such Income is paid, or on such other date as the Parties may from time to time agree, pay or deliver to Borrower a sum of money or property as is agreed between the Parties or, failing such agreement, a sum of money or property equivalent to (and in the same currency as) the type and amount of such Income that would be received by Lender in respect of such Non Cash Collateral assuming Lender:

(a)    retained the Non Cash Collateral on the Income Record Date; and

(b)    is not entitled to any credit, benefit or other relief in respect of Tax under any Applicable Law.

6.4    **Indemnity for failure to redeliver Equivalent Non-Cash Collateral**

Unless paragraph 1.6 of the Schedule indicates that this paragraph does not apply, where:

(a)    prior to any Income Record Date in relation to Non Cash Collateral, Borrower has in accordance with paragraph 5.3 called for the Delivery of Equivalent Non Cash Collateral;

(b)    Borrower has given notice of such call to Lender so as to be effective, at the latest, five hours before the Close of Business on the last Business Day on which Lender would customarily be required to initiate settlement of the Non Cash Collateral to enable settlement to take place on the Business Day immediately preceding the relevant Income Record Date;

(c)    Borrower has provided reasonable details to Lender of the Non Cash Collateral, the relevant Income Record Date and the proposed Alternative Collateral;

(d)    Lender, acting reasonably, has determined that such Alternative Collateral is acceptable to it and Borrower shall have delivered or delivers such Alternative Collateral to Lender; and

(e)    Lender has failed to make reasonable efforts to transfer Equivalent Non Cash Collateral to Borrower prior to such Income Record Date,

Lender shall indemnify Borrower in respect of any cost, loss or damage (excluding any indirect or consequential loss or damage or any amount otherwise compensated by Lender, including pursuant to paragraphs 6.3 and/or 9.3) suffered by Borrower that it would not have suffered had the relevant Equivalent Non Cash Collateral been transferred to Borrower prior to such Income Record Date.

6.5    **Income in the form of Securities**

Where Income, in the form of securities, is paid in relation to any Loaned Securities or Collateral, such securities shall be added to such Loaned Securities or Collateral (and shall constitute Loaned Securities or Collateral, as the case may be, and be part of the relevant Loan) and will not be delivered to Lender, in the case of Loaned Securities, or to Borrower, in the case of Collateral, until the end of the relevant Loan, provided that the Lender or Borrower (as the case may be) fulfils its obligations under paragraph 5.4 or 5.5 (as applicable) with respect to the additional Loaned Securities or Collateral, as the case may be.

6.6    **Exercise of voting rights**

Where any voting rights fall to be exercised in relation to any Loaned Securities or Collateral, neither Borrower, in the case of Equivalent Securities, nor Lender, in the case of Equivalent Collateral, shall have any obligation to arrange for voting rights of that kind to be exercised in accordance with the instructions of the other Party in relation to the Securities borrowed by it or transferred to it by way of Collateral, as the case may be, unless otherwise agreed between the Parties.

6.7    **Corporate actions**

Where, in respect of any Loaned Securities or any Collateral, any rights relating to conversion, sub division, consolidation, pre emption, rights arising under a takeover offer, rights to receive securities or a certificate which may at a future date be exchanged for securities or other rights, including those requiring election by the holder for the time being of such Securities or Collateral, become exercisable prior to the delivery of Equivalent Securities or Equivalent Collateral, then Lender or Borrower, as

the case may be, may, within a reasonable time before the latest time for the exercise of the right or option give written notice to the other Party that on delivery of Equivalent Securities or Equivalent Collateral, as the case may be, it wishes to receive Equivalent Securities or Equivalent Collateral in such form as will arise if the right is exercised or, in the case of a right which may be exercised in more than one manner, is exercised as is specified in such written notice.

## 7.    RATES APPLICABLE TO LOANED SECURITIES AND CASH COLLATERAL

### 7.1    Rates in respect of Loaned Securities

In respect of each Loan, Borrower shall pay to Lender, in the manner prescribed in sub paragraph 7.3, sums calculated by applying such rate as shall be agreed between the Parties from time to time to the daily Market Value of the Loaned Securities.

### 7.2    Rates in respect of Cash Collateral

Where Cash Collateral is deposited with Lender in respect of any Loan, Lender shall pay to Borrower, in the manner prescribed in paragraph 7.3, sums calculated by applying such rates as shall be agreed between the Parties from time to time to the amount of such Cash Collateral.  Any such payment due to Borrower may be set off against any payment due to Lender pursuant to paragraph 7.1.

### 7.3    Payment of rates

In respect of each Loan, the payments referred to in paragraph 7.1 and 7.2 shall accrue daily in respect of the period commencing on and inclusive of the Settlement Date and terminating on and exclusive of the Business Day upon which Equivalent Securities are delivered or Cash Collateral is repaid.  Unless otherwise agreed, the sums so accruing in respect of each calendar month shall be paid in arrears by the relevant Party not later than the Business Day which is the tenth Business Day after the last Business Day of the calendar month to which such payments relate or such other date as the Parties shall from time to time agree.

## 8.    DELIVERY OF EQUIVALENT SECURITIES

### 8.1    Lender's right to terminate a Loan

Subject to paragraph 11 and the terms of the relevant Loan, Lender shall be entitled to terminate a Loan and to call for the delivery of all or any Equivalent Securities at any time by giving notice on any Business Day of not less than the standard settlement time for such Equivalent Securities on the exchange or in the clearing organisation through which the Loaned Securities were originally delivered.  Borrower shall deliver such Equivalent Securities not later than the expiry of such notice in accordance with Lender's instructions.

### 8.2    Borrower's right to terminate a Loan

Subject to the terms of the relevant Loan, Borrower shall be entitled at any time to terminate a Loan and to deliver all and any Equivalent Securities due and outstanding to Lender in accordance with Lender's instructions and Lender shall accept such delivery.

8.3     **Delivery of Equivalent Securities on termination of a Loan**

Borrower shall procure the Delivery of Equivalent Securities to Lender or deliver Equivalent Securities in accordance with this Agreement and the terms of the relevant Loan on termination of the Loan.  For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (howsoever expressed) to an obligation to deliver or account for or act in relation to Loaned Securities shall accordingly be construed as a reference to an obligation to deliver or account for or act in relation to Equivalent Securities.

8.4     **Delivery of Equivalent Collateral on termination of a Loan**

On the date and time that Equivalent Securities are required to be delivered by Borrower on the termination of a Loan, Lender shall simultaneously (subject to paragraph 5.4 if applicable) repay to Borrower any Cash Collateral or, as the case may be, deliver Collateral equivalent to the Collateral provided by Borrower pursuant to paragraph 5 in respect of such Loan.  For the avoidance of doubt any reference in this Agreement or in any other agreement or communication between the Parties (however expressed) to an obligation to deliver or account for or act in relation to Collateral shall accordingly be construed as a reference to an obligation to deliver or account for or act in relation to Equivalent Collateral.

8.5     **Delivery of Letters of Credit**

Where a Letter of Credit is provided by way of Collateral, the obligation to deliver Equivalent Collateral is satisfied by Lender delivering for cancellation the Letter of Credit so provided, or where the Letter of Credit is provided in respect of more than one Loan, by Lender consenting to a reduction in the value of the Letter of Credit.

8.6     **Delivery obligations to be reciprocal**

Neither Party shall be obliged to make delivery (or make a payment as the case may be) to the other unless it is satisfied that the other Party will make such delivery (or make an appropriate payment as the case may be) to it.  If it is not so satisfied (whether because an Event of Default has occurred in respect of the other Party or otherwise) it shall notify the other Party and unless that other Party has made arrangements which are sufficient to assure full delivery (or the appropriate payment as the case may be) to the notifying Party, the notifying Party shall (provided it is itself in a position, and willing, to perform its own obligations) be entitled to withhold delivery (or payment, as the case may be) to the other Party until such arrangements to assure full delivery (or the appropriate payment as the case may be) are made.

**9.      FAILURE TO DELIVER**

9.1     Borrower's failure to deliver Equivalent Securities

If Borrower fails to deliver Equivalent Securities in accordance with paragraph 8.3 Lender may:

(a)     elect to continue the Loan (which, for the avoidance of doubt, shall continue to be taken into account for the purposes of paragraph 5.4 or 5.5 as applicable); or

(b)     at any time while such failure continues, by written notice to Borrower declare that that Loan (but only that Loan) shall be terminated immediately in accordance with paragraph 11.2 as if (i) an Event of Default had occurred in relation to the Borrower, (ii) references to the Termination Date were to the date on which notice was given under this sub paragraph, and (iii) the Loan were the only Loan outstanding.  For the avoidance of doubt, any such failure shall not constitute an Event of Default (including under paragraph 10.1(i)) unless the Parties otherwise agree.

9.2     **Lender's failure to deliver Equivalent Collateral**

If Lender fails to deliver Equivalent Collateral comprising Non Cash Collateral in accordance with paragraph 8.4 or 8.5, Borrower may:

(a)     elect to continue the Loan (which, for the avoidance of doubt, shall continue to be taken into account for the purposes of paragraph 5.4 or 5.5 as applicable); or

(b)     at any time while such failure continues, by written notice to Lender declare that that Loan (but only that Loan) shall be terminated immediately in accordance with paragraph 11.2 as if (i) an Event of Default had occurred in relation to the Lender, (ii) references to the Termination Date were to the date on which notice was given under this sub paragraph, and (iii) the Loan were the only Loan outstanding.  For the avoidance of doubt, any such failure shall not constitute an Event of Default (including under paragraph 10.1(i)) unless the Parties otherwise agree.

9.3     **Failure by either Party to deliver**

Where a Party (the **Transferor**) fails to deliver Equivalent Securities or Equivalent Collateral by the time required under this Agreement or within such other period as may be agreed between the Transferor and the other Party (the **Transferee**) and the Transferee:

(a)     incurs interest, overdraft or similar costs and expenses; or

(b)     incurs costs and expenses as a direct result of a Buy in exercised against it by a third party,

then the Transferor agrees to pay within one Business Day of a demand from the Transferee and hold harmless the Transferee with respect to all reasonable costs and expenses listed in sub paragraphs (a) and (b) above properly incurred which arise directly from such failure other than (i) such costs and expenses which arise from the negligence or wilful default of the Transferee and (ii) any indirect or consequential losses.

## 10.    EVENTS OF DEFAULT

10.1    Each of the following events occurring and continuing in relation to either Party (the **Defaulting Party**, the other Party being the **Non Defaulting Party**) shall be an Event of Default but only (subject to sub paragraph 10.1(d)) where the Non Defaulting Party serves written notice on the Defaulting Party:

(a)    Borrower or Lender failing to pay or repay Cash Collateral or to deliver Collateral on commencement of the Loan under paragraph 5.1 or to deliver further Collateral under paragraph 5.4 or 5.5;

(b)    Lender or Borrower failing to comply with its obligations under paragraph 6.2 or 6.3 upon the due date and not remedying such failure within three Business Days after the Non Defaulting Party serves written notice requiring it to remedy such failure;

(c)    Lender or Borrower failing to pay any sum due under paragraph 9.1(b), 9.2(b) or 9.3 upon the due date;

(d)    an Act of Insolvency occurring with respect to Lender or Borrower, provided that, where the Parties have specified in paragraph 5 of the Schedule that Automatic Early Termination shall apply, an Act of Insolvency which is the presentation of a petition for winding up or any analogous proceeding or the appointment of a liquidator or analogous officer of the Defaulting Party shall not require the Non Defaulting Party to serve written notice on the Defaulting Party (**Automatic Early Termination**);

(e)    any warranty made by Lender or Borrower in paragraph 13 or paragraphs 14(a) to 14(d) being incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated;

(f)    Lender or Borrower admitting to the other that it is unable to, or it intends not to, perform any of its obligations under this Agreement and/or in respect of any Loan where such failure to perform would with the service of notice or lapse of time constitute an Event of Default;

(g)    all or any material part of the assets of Lender or Borrower being transferred or ordered to be transferred to a trustee (or a person exercising similar functions) by a regulatory authority pursuant to any legislation;

(h)    Lender (if applicable) or Borrower being declared in default or being suspended or expelled from membership of or participation in, any securities exchange or suspended or prohibited from dealing in securities by any regulatory authority, in each case on the grounds that it has failed to meet any requirements relating to financial resources or credit rating; or

(i)    Lender or Borrower failing to perform any other of its obligations under this Agreement and not remedying such failure within 30 days after the Non Defaulting Party serves written notice requiring it to remedy such failure.

10.2 Each Party shall notify the other (in writing) if an Event of Default or an event which, with the passage of time and/or upon the serving of a written notice as referred to above, would be an Event of Default, occurs in relation to it.

10.3 The provisions of this Agreement constitute a complete statement of the remedies available to each Party in respect of any Event of Default.

10.4 Subject to paragraphs 9 and 11, neither Party may claim any sum by way of consequential loss or damage in the event of failure by the other Party to perform any of its obligations under this Agreement.

**11. CONSEQUENCES OF AN EVENT OF DEFAULT**

11.1 If an Event of Default occurs in relation to either Party then paragraphs 11.2 to 11.7 below shall apply.

11.2 The Parties' delivery and payment obligations (and any other obligations they have under this Agreement) shall be accelerated so as to require performance thereof at the time such Event of Default occurs (the date of which shall be the *Termination Date*) so that performance of such delivery and payment obligations shall be effected only in accordance with the following provisions.

(a) The Default Market Value of the Equivalent Securities and Equivalent Non-Cash Collateral to be delivered and the amount of any Cash Collateral (including sums accrued) to be repaid and any other cash (including interest accrued) to be paid by each Party shall be established by the Non Defaulting Party in accordance with paragraph 11.4 and deemed as at the Termination Date.

(b) On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each Party to the other under this Agreement (on the basis that each Party's claim against the other in respect of delivery of Equivalent Securities or Equivalent Non-Cash Collateral equal to the Default Market Value thereof) and the sums due from one Party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the Party having the claim valued at the lower amount pursuant to the foregoing) and such balance shall be payable on the next following Business Day after such account has been taken and such sums have been set off in accordance with this paragraph. For the purposes of this calculation, any sum not denominated in the Base Currency shall be converted into the Base Currency at the Spot Rate prevailing at such dates and times determined by the Non Defaulting Party acting reasonably.

(c) If the balance under sub paragraph (b) above is payable by the Non Defaulting Party and the Non Defaulting Party had delivered to the Defaulting Party a Letter of Credit, the Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently deliver for cancellation the Letter of Credit so provided.

(d) If the balance under sub paragraph (b) above is payable by the Defaulting Party and the Defaulting Party had delivered to the Non Defaulting Party a Letter of

Credit, the Non Defaulting Party shall draw on the Letter of Credit to the extent of the balance due and shall subsequently deliver for cancellation the Letter of Credit so provided.

(e)    In all other circumstances, where a Letter of Credit has been provided to a Party, such Party shall deliver for cancellation the Letter of Credit so provided.

11.3    For the purposes of this Agreement, the **Default Market Value** of any Equivalent Collateral in the form of a Letter of Credit shall be zero and of any Equivalent Securities or any other Equivalent Non-Cash Collateral shall be determined in accordance with paragraphs 11.4 to 11.6 below, and for this purpose:

(a)    the **Appropriate Market** means, in relation to securities of any description, the market which is the most appropriate market for securities of that description, as determined by the Non Defaulting Party;

(b)    the **Default Valuation Time** means, in relation to an Event of Default, the close of business in the Appropriate Market on the fifth dealing day after the day on which that Event of Default occurs or, where that Event of Default is the occurrence of an Act of Insolvency in respect of which under paragraph 10.1(d) no notice is required from the Non Defaulting Party in order for such event to constitute an Event of Default, the close of business on the fifth dealing day after the day on which the Non Defaulting Party first became aware of the occurrence of such Event of Default;

(c)    **Deliverable Securities** means Equivalent Securities or Equivalent Non-Cash Collateral to be delivered by the Defaulting Party;

(d)    **Net Value** means at any time, in relation to any Deliverable Securities or Receivable Securities, the amount which, in the reasonable opinion of the Non Defaulting Party, represents their fair market value, having regard to such pricing sources and methods (which may include, without limitation, available prices for securities with similar maturities, terms and credit characteristics as the relevant Equivalent Securities or Equivalent Collateral) as the Non Defaulting Party considers appropriate, less, in the case of Receivable Securities, or plus, in the case of Deliverable Securities, all Transaction Costs incurred or reasonably anticipated in connection with the purchase or sale of such securities;

(e)    **Receivable Securities** means Equivalent Securities or Equivalent Non-Cash Collateral to be delivered to the Defaulting Party; and

(f)    **Transaction Costs** in relation to any transaction contemplated in paragraph 11.4 or 11.5 means the reasonable costs, commissions (including internal commissions), fees and expenses (including any mark up or mark down or premium paid for guaranteed delivery) incurred or reasonably anticipated in connection with the purchase of Deliverable Securities or sale of Receivable Securities, calculated on the assumption that the aggregate thereof is the least that could reasonably be expected to be paid in order to carry out the transaction.

78YORK00000796

**11.4**    **If between the Termination Date and the Default Valuation Time**:

(a)    the Non Defaulting Party has sold, in the case of Receivable Securities, or purchased, in the case of Deliverable Securities, securities which form part of the same issue and are of an identical type and description as those Equivalent Securities or that Equivalent Collateral, (and regardless as to whether or not such sales or purchases have settled) the Non Defaulting Party may elect to treat as the Default Market Value:

(i)    in the case of Receivable Securities, the net proceeds of such sale after deducting all Transaction Costs; provided that, where the securities sold are not identical in amount to the Equivalent Securities or Equivalent Collateral, the Non Defaulting Party may, acting in good faith, either (A) elect to treat such net proceeds of sale divided by the amount of securities sold and multiplied by the amount of the Equivalent Securities or Equivalent Collateral as the Default Market Value or (B) elect to treat such net proceeds of sale of the Equivalent Securities or Equivalent Collateral actually sold as the Default Market Value of that proportion of the Equivalent Securities or Equivalent Collateral, and, in the case of (B), the Default Market Value of the balance of the Equivalent Securities or Equivalent Collateral shall be determined separately in accordance with the provisions of this paragraph 11.4; or

(ii)    in the case of Deliverable Securities, the aggregate cost of such purchase, including all Transaction Costs; provided that, where the securities purchased are not identical in amount to the Equivalent Securities or Equivalent Collateral, the Non Defaulting Party may, acting in good faith, either (A) elect to treat such aggregate cost divided by the amount of securities purchased and multiplied by the amount of the Equivalent Securities or Equivalent Collateral as the Default Market Value or (B) elect to treat the aggregate cost of purchasing the Equivalent Securities or Equivalent Collateral actually purchased as the Default Market Value of that proportion of the Equivalent Securities or Equivalent Collateral, and, in the case of (B), the Default Market Value of the balance of the Equivalent Securities or Equivalent Collateral shall be determined separately in accordance with the provisions of this paragraph 11.4;

(b)    the Non Defaulting Party has received, in the case of Deliverable Securities, offer quotations or, in the case of Receivable Securities, bid quotations in respect of securities of the relevant description from two or more market makers or regular dealers in the Appropriate Market in a commercially reasonable size (as determined by the Non Defaulting Party) the Non-Defaulting Party may elect to treat as the Default Market Value of the relevant Equivalent Securities or Equivalent Collateral:

(i)    the price quoted (or where more than one price is so quoted, the arithmetic mean of the prices so quoted) by each of them for, in the case of Deliverable Securities, the sale by the relevant market marker or dealer of such securities or, in the case of Receivable Securities, the

purchase by the relevant market maker or dealer of such securities, provided that such price or prices quoted may be adjusted in a commercially reasonable manner by the Non Defaulting Party to reflect accrued but unpaid coupons not reflected in the price or prices quoted in respect of such Securities;

(ii)    after deducting, in the case of Receivable Securities or adding in the case of Deliverable Securities the Transaction Costs which would be incurred or reasonably anticipated in connection with such transaction.

11.5    If, acting in good faith, either (A) the Non Defaulting Party has endeavoured but been unable to sell or purchase securities in accordance with paragraph 11.4(a) above or to obtain quotations in accordance with paragraph 11.4(b) above (or both) or (B) the Non Defaulting Party has determined that it would not be commercially reasonable to sell or purchase securities at the prices bid or offered or to obtain such quotations, or that it would not be commercially reasonable to use any quotations which it has obtained under paragraph 11.4(b) above the Non Defaulting Party may determine the Net Value of the relevant Equivalent Securities or Equivalent Collateral (which shall be specified) and the Non Defaulting Party may elect to treat such Net Value as the Default Market Value of the relevant Equivalent Securities or Equivalent Collateral.

11.6    To the extent that the Non Defaulting Party has not determined the Default Market Value in accordance with paragraph 11.4, the Default Market Value of the relevant Equivalent Securities or Equivalent Collateral shall be an amount equal to their Net Value at the Default Valuation Time; provided that, if at the Default Valuation Time the Non Defaulting Party reasonably determines that, owing to circumstances affecting the market in the Equivalent Securities or Equivalent Collateral in question, it is not reasonably practicable for the Non Defaulting Party to determine a Net Value of such Equivalent Securities or Equivalent Collateral which is commercially reasonable (by reason of lack of tradable prices or otherwise), the Default Market Value of such Equivalent Securities or Equivalent Collateral shall be an amount equal to their Net Value as determined by the Non Defaulting Party as soon as reasonably practicable after the Default Valuation Time.

**Other costs, expenses and interest payable in consequence of an Event of Default**

11.7    The Defaulting Party shall be liable to the Non-Defaulting Party for the amount of all reasonable legal and other professional expenses incurred by the Non Defaulting Party in connection with or as a consequence of an Event of Default, together with interest thereon at such rate as is agreed by the Parties and specified in paragraph 10 of the Schedule or, failing such agreement, the overnight London Inter Bank Offered Rate as quoted on a reputable financial information service (*LIBOR*) as at 11.00 a.m., London time, on the date on which it is to be determined or, in the case of an expense attributable to a particular transaction, and, where the Parties have previously agreed a rate of interest for the transaction, that rate of interest if it is greater than LIBOR. Interest will accrue daily on a compound basis.

**Set off**

11.8    Any amount payable to one Party (the **Payee**) by the other Party (the **Payer**) under paragraph 11.2(b) may, at the option of the Non Defaulting Party, be reduced by its set off against any amount payable (whether at such time or in the future or upon the occurrence of a contingency) by the Payee to the Payer (irrespective of the currency, place of payment or booking office of the obligation) under any other agreement between the Payee and the Payer or instrument or undertaking issued or executed by one Party to, or in favour of, the other Party.  If an obligation is unascertained, the Non Defaulting Party may in good faith estimate that obligation and set off in respect of the estimate, subject to accounting to the other Party when the obligation is ascertained. Nothing in this paragraph shall be effective to create a charge or other security interest. This paragraph shall be without prejudice and in addition to any right of set off, combination of accounts, lien or other right to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

## 12.    TAXES

**Withholding, gross up and provision of information**

12.1    All payments under this Agreement shall be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any Applicable Law.

12.2    Except as otherwise agreed, if the paying Party is so required to deduct or withhold, then that Party (**Payer**) shall:

(a)    promptly notify the other Party (**Recipient**) of such requirement;

(b)    pay or otherwise account for the full amount required to be deducted or withheld to the relevant authority;

(c)    upon written demand of Recipient, forward to Recipient documentation reasonably acceptable to Recipient, evidencing such payment to such authorities; and

(d)    other than in respect of any payment made by Lender to Borrower under paragraph 6.3, pay to Recipient, in addition to the payment to which Recipient is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the amount actually received by Recipient (after taking account of such withholding or deduction) will equal the amount Recipient would have received had no such deduction or withholding been required; provided Payer will not be required to pay any additional amount to Recipient under this sub paragraph (d) to the extent it would not be required to be paid but for the failure by Recipient to comply with or perform any obligation under paragraph 12.3.

12.3    Each Party agrees that it will upon written demand of the other Party deliver to such other Party (or to any government or other taxing authority as such other Party directs), any form or document and provide such other cooperation or assistance as may (in either case) reasonably be required in order to allow such other Party to make a payment under this Agreement without any deduction or withholding for or on account of

any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document, or the provision of such cooperation or assistance, would not materially prejudice the legal or commercial position of the Party in receipt of such demand). Any such form or document shall be accurate and completed in a manner reasonably satisfactory to such other Party and shall be executed and delivered with any reasonably required certification by such date as is agreed between the Parties or, failing such agreement, as soon as reasonably practicable.

**Stamp Tax**

12.4    Unless otherwise agreed, Borrower hereby undertakes promptly to pay and account for any Stamp Tax chargeable in connection with any transaction effected pursuant to or contemplated by this Agreement (other than any Stamp Tax that would not be chargeable but for Lender's failure to comply with its obligations under this Agreement).

12.5    Borrower shall indemnify and keep indemnified Lender against any liability arising as a result of Borrower's failure to comply with its obligations under paragraph 12.4.

**Sales Tax**

12.6    All sums payable by one Party to another under this Agreement are exclusive of any Sales Tax chargeable on any supply to which such sums relate and an amount equal to such Sales Tax shall in each case be paid by the Party making such payment on receipt of an appropriate Sales Tax invoice.

**Retrospective changes in law**

12.7    Unless otherwise agreed, amounts payable by one Party to another under this Agreement shall be determined by reference to Applicable Law as at the date of the relevant payment and no adjustment shall be made to amounts paid under this Agreement as a result of:

(a)    any retrospective change in Applicable Law which is announced or enacted after the date of the relevant payment; or

(b)    any decision of a court of competent jurisdiction which is made after the date of the relevant payment (other than where such decision results from an action taken with respect to this Agreement or amounts paid or payable under this Agreement).

13.    **LENDER'S WARRANTIES**

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Lender:

(a)    it is duly authorised and empowered to perform its duties and obligations under this Agreement;

78YORK00000800

(b)     it is not restricted under the terms of its constitution or in any other manner from lending Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c)     it is absolutely entitled to pass full legal and beneficial ownership of all Securities provided by it hereunder to Borrower free from all liens, charges and encumbrances; and

(d)     it is acting as principal in respect of this Agreement, other than in respect of an Agency Loan.

## 14.     BORROWER'S WARRANTIES

Each Party hereby warrants and undertakes to the other on a continuing basis to the intent that such warranties shall survive the completion of any transaction contemplated herein that, where acting as a Borrower:

(a)     it has all necessary licences and approvals, and is duly authorised and empowered, to perform its duties and obligations under this Agreement and will do nothing prejudicial to the continuation of such authorisation, licences or approvals;

(b)     it is not restricted under the terms of its constitution or in any other manner from borrowing Securities in accordance with this Agreement or from otherwise performing its obligations hereunder;

(c)     it is absolutely entitled to pass full legal and beneficial ownership of all Collateral provided by it hereunder to Lender free from all liens, charges and encumbrances;

(d)     it is acting as principal in respect of this Agreement; and

(e)     it is not entering into a Loan for the primary purpose of obtaining or exercising voting rights in respect of the Loaned Securities.

## 15.     INTEREST ON OUTSTANDING PAYMENTS

In the event of either Party failing to remit sums in accordance with this Agreement such Party hereby undertakes to pay to the other Party upon demand interest (before as well as after judgment) on the net balance due and outstanding, for the period commencing on and inclusive of the original due date for payment to (but excluding) the date of actual payment, in the same currency as the principal sum and at the rate referred to in paragraph 11.7.  Interest will accrue daily on a compound basis and will be calculated according to the actual number of days elapsed.  No interest shall be payable under this paragraph in respect of any day on which one Party endeavours to make a payment to the other Party but the other Party is unable to receive it.

78YORK00000801

**16.    TERMINATION OF THIS AGREEMENT**

Each Party shall have the right to terminate this Agreement by giving not less than 15 Business Days' notice in writing to the other Party (which notice shall specify the date of termination) subject to an obligation to ensure that all Loans which have been entered into but not discharged at the time such notice is given are duly discharged in accordance with this Agreement.

**17.    SINGLE AGREEMENT**

Each Party acknowledges that, and has entered into this Agreement and will enter into each Loan in consideration of and in reliance upon the fact that, all Loans constitute a single business and contractual relationship and are made in consideration of each other.  Accordingly, each Party agrees:

(a)    to perform all of its obligations in respect of each Loan, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Loans, subject always to the other provisions of the Agreement; and

(b)    that payments, deliveries and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Loan.

**18.    SEVERANCE**

If any provision of this Agreement is declared by any judicial or other competent authority to be void or otherwise unenforceable, that provision shall be severed from the Agreement and the remaining provisions of this Agreement shall remain in full force and effect.  The Agreement shall, however, thereafter be amended by the Parties in such reasonable manner so as to achieve as far as possible, without illegality, the intention of the Parties with respect to that severed provision.

**19.    SPECIFIC PERFORMANCE**

Each Party agrees that in relation to legal proceedings it will not seek specific performance of the other Party's obligation to deliver Securities, Equivalent Securities, Collateral or Equivalent Collateral but without prejudice to any other rights it may have.

**20.    NOTICES**

20.1    Any notice or other communication in respect of this Agreement may be given in any manner set forth below to the address or number or in accordance with the electronic messaging system details set out in paragraph 5 of the Schedule and will be deemed effective as indicated:

(a)    if in writing and delivered in person or by courier, on the date it is delivered;

(b)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the

burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(c)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(d)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or the receipt, as applicable, is not a Business Day or that communication is delivered (or attempted) or received, as applicable, after the Close of Business on a Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Business Day.

20.2    Either Party may by notice to the other change the address or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 21.    ASSIGNMENT

21.1    Subject to paragraph 21.2, neither Party may charge, assign or otherwise deal with all or any of its rights or obligations hereunder without the prior consent of the other Party.

21.2    Paragraph 21.1 shall not preclude a party from charging, assigning or otherwise dealing with all or any part of its interest in any sum payable to it under paragraph 11.2(b) or 11.7.

## 22.    NON WAIVER

No failure or delay by either Party (whether by course of conduct or otherwise) to exercise any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege as herein provided.

## 23.    GOVERNING LAW AND JURISDICTION

23.1    This Agreement and any non-contractual obligations arising out of or in connection with this Agreement shall be governed by, and shall be construed in accordance with, English law.

23.2    The courts of England have exclusive jurisdiction to hear and decide any suit, action or proceedings, and to settle any disputes or any non-contractual obligation which may arise out of or in connection with this Agreement (respectively, ***Proceedings*** and ***Disputes***) and, for these purposes, each Party irrevocably submits to the jurisdiction of the courts of England.

23.3    Each Party irrevocably waives any objection which it might at any time have to the courts of England being nominated as the forum to hear and decide any Proceedings and to settle any Disputes and agrees not to claim that the courts of England are not a convenient or appropriate forum.

23.4    Each Party hereby respectively appoints the person identified in paragraph 7 of the Schedule pertaining to the relevant Party as its agent to receive on its behalf service of process in the courts of England.  If such an agent ceases to be an agent of a Party, the relevant Party shall promptly appoint, and notify the other Party of the identity of its new agent in England.

## 24.    TIME

Time shall be of the essence of the Agreement.

## 25.    RECORDING

The Parties agree that each may record all telephone conversations between them.

## 26.    WAIVER OF IMMUNITY

Each Party hereby waives all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any action or proceeding in the courts of England or of any other country or jurisdiction relating in any way to this Agreement and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

## 27.    MISCELLANEOUS

27.1    This Agreement constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

27.2    The Party (the **Relevant Party**) who has prepared the text of this Agreement for execution (as indicated in paragraph 9 of the Schedule) warrants and undertakes to the other Party that such text conforms exactly to the text of the standard form Global Master Securities Lending Agreement (2009 version) posted by the International Securities Lending Association on its website except as notified by the Relevant Party to the other Party in writing prior to the execution of this Agreement.

27.3    Unless otherwise provided for in this Agreement, no amendment in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the Parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

27.4    The Parties agree that where paragraph 11 of the Schedule indicates that this paragraph 27.4 applies, this Agreement shall apply to all loans which are outstanding as at the date of this Agreement and which are subject to the securities lending agreement or agreements specified in paragraph 11 of the Schedule, and such Loans shall be

78YORK00000804

treated as if they had been entered into under this Agreement, and the terms of such loans are amended accordingly with effect from the date of this Agreement.

27.5  The Parties agree that where paragraph 12 of the Schedule indicates that this paragraph 27.5 applies, each may use the services of a third party vendor to automate the processing of Loans under this Agreement and that any data relating to such Loans received from the other Party may be disclosed to such third party vendors.

27.6  The obligations of the Parties under this Agreement will survive the termination of any Loan.

27.7  The warranties contained in paragraphs 13, 14 and 27.2 and in the Agency Annex will survive termination of this Agreement for so long as any obligations of either of the Parties pursuant to this Agreement remain outstanding.

27.8  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

27.9  This Agreement (and each amendment in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

27.10  A person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any terms of this Agreement, but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

78YORK00000805

**EXECUTED by the PARTIES**

| | |
|---|---|
| **SIGNED** by | ) |
| **Neoteric Limited** | ) |
| duly authorised for and | ) |
| on behalf of | ) |

Martin Smith - CEO


| | |
|---|---|
| **SIGNED** by | ) |
| **MDP5 Investment Trust** | ) |
| duly authorised for and | ) |
| on behalf of | ) |

Roger Lehman - Authorised Trader

**SCHEDULE**

1. **COLLATERAL**

1.1   The securities, financial instruments and deposits of currency set out in the table below with a cross marked next to them are acceptable forms of Collateral under this Agreement.

1.2   Unless otherwise agreed between the Parties, the Market Value of the Collateral delivered pursuant to paragraph 5 by Borrower to Lender under the terms and conditions of this Agreement shall on each Business Day represent not less than the Market Value of the Loaned Securities together with the percentage contained in the row of the table below corresponding to the particular form of Collateral, referred to in this Agreement as the Margin.

| Security/Financial Instrument/Deposit of Currency | Mark "X" if acceptable form of Collateral | Margin (%) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

1.3   Basis of Margin Maintenance:

Paragraph 5.4 (aggregation) shall not apply*                                  ☐

Paragraph 5.4 (aggregation) applies unless the box is ticked.

1.4   Paragraph 5.6 (netting of obligations to deliver

Collateral and redeliver Equivalent Collateral) shall not apply*            ☐

Paragraph 5.6 (netting) applies unless the box is ticked

1.5   For the purposes of Paragraph 5.8, Notification Time means by ☐, London time.

1.6   Paragraph 6.4 (indemnity for failure to redeliver

---

* Delete as appropriate.

* Delete as appropriate.

Equivalent Non-Cash Collateral) shall not apply*                                    ☐

Paragraph 6.4 (indemnity for failure to redeliver Equivalent Non-Cash Collateral) applies unless the box is ticked.

**2.      BASE CURRENCY**

The Base Currency applicable to this Agreement is                          provided that if that currency ceases to be freely convertible the Base Currency shall be [US Dollars] [Euro] [specify other currency]*

**3.      PLACES OF BUSINESS**

(See definition of Business Day.)

**4.      MARKET VALUE**

(See definition of Market Value.)

**5.      EVENTS OF DEFAULT**

Automatic Early Termination shall apply in respect of Party A                ☐

Automatic Early Termination shall apply in respect of Party B                ☐

**6.      DESIGNATED OFFICE AND ADDRESS FOR NOTICES**

(a)      **Designated office of Party A:**

Address for notices or communications to Party A:

Address:

Attention:

Facsimile No:

Telephone No:

Electronic Messaging System Details:

(b)      **Designated office of Party B:**

Address for notices or communications to Party B:

---

* Delete as appropriate.

78YORK00000808

Address:

Attention:

Facsimile No:

Telephone No:

Electronic Messaging System Details:

7.(a)   **Agent of Party A for Service of Process**

Name:

Address:

(b)   **Agent of Party B for Service of Process**

Name:

Address:

8.   **AGENCY**

–   Party A [may][will always]* act as agent                                  ☐

–   Party B [may][will always]* act as agent                                  ☐

–   The Addendum for Pooled Principal Transactions
    may apply to Party A                                                       ☐

–   The Addendum for Pooled Principal Transactions
    may apply to Party B                                                       ☐

9.   **PARTY PREPARING THIS AGREEMENT**

Party A

Party B

10.   **DEFAULT INTEREST**

Rate of default interest:

11.   **EXISTING LOANS**

78YORK00000809

Paragraph 27.4 applies*                                                                ☐

[Overseas Securities Lenders Agreement dated             ]*

[Global Master Securities Lending Agreements dated      ]*

12.    **AUTOMATION**

Paragraph 27.5 applies*                                                                ☐

---

* Delete as appropriate.

**AGENCY ANNEX**

**1.    TRANSACTIONS ENTERED INTO AS AGENT**

1.1    **Power for Lender to enter into Loans as agent**

Subject to the following provisions of this paragraph, Lender may enter into Loans as agent (in such capacity, the ***Agent***) for a third person (a ***Principal***), whether as custodian or investment manager or otherwise (a Loan so entered into being referred to in this paragraph as an ***Agency Loan***).

If the Lender has indicated in paragraph 8 of the Schedule that it may act as Agent, it must identify each Loan in respect of which it acts as Agent as an Agency Loan at the time it is entered into.  If the Lender has indicated in paragraph 8 of the Schedule that it will always act as Agent, it need not identify each Loan as an Agency Loan.

1.2    **[Pooled Principal transactions**

The Lender may enter into an Agency Loan on behalf of more than [one] Principal and accordingly the addendum hereto for pooled principal transactions shall apply.]*

1.3    **Conditions for Agency Loan**

A Lender may enter into an Agency Loan if, but only if:

(a)    it provides to Borrower, prior to effecting any Agency Loan, such information in its possession necessary to complete all required fields in the format generally used in the industry, or as otherwise agreed by Agent and Borrower (***Agreed Format***), and will use its best efforts to provide to Borrower any optional information that may be requested by the Borrower for the purpose of identifying such Principal (all such information being the ***Principal Information***). Agent represents and warrants that the Principal Information is true and accurate to the best of its knowledge and has been provided to it by Principal;

(b)    it enters into that Loan on behalf of a single Principal whose identity is disclosed to Borrower (whether by name or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) either at the time when it enters into the Loan or before the Close of Business on the next Business Day after the date on which Loaned Securities are transferred to the Borrower in the Agreed Format or as otherwise agreed between the Parties; and

(c)    it has at the time when the Loan is entered into actual authority to enter into the Loan and to perform on behalf of that Principal all of that Principal's obligations under the agreement referred to in paragraph 1.5(b) below.

Agent agrees that it will not effect any Loan with Borrower on behalf of any Principal unless Borrower has notified Agent of Borrower's approval of such Principal, and has not notified Agent that it has withdrawn such approval (such

Principal, an **Approved Principal**), with both such notifications in the Agreed Format.

Borrower acknowledges that Agent shall not have any obligation to provide it with confidential information regarding the financial status of its Principals; Agent agrees, however, that it will assist Borrower in obtaining from Agent's Principals such information regarding the financial status of such Principals as Borrower may reasonably request.

1.4    **Notification by Agent of certain events affecting any Principal**

Agent undertakes that, if it enters as agent into an Agency Loan, forthwith upon becoming aware:

(a)    of any event which constitutes an Act of Insolvency with respect to the relevant Principal; or

(b)    of any breach of any of the warranties given in paragraph 1.6 below or of any event or circumstance which results in any such warranty being untrue if repeated by reference to the then current facts,

it will inform Borrower of that fact and will, if so required by Borrower, furnish it with such additional information as it may reasonably request to the extent that such information is readily obtainable by Agent.

1.5    **Status of Agency Loan**

(a)    Each Agency Loan shall be a transaction between the relevant Principal and Borrower and no person other than the relevant Principal and Borrower shall be a party to or have any rights or obligations under an Agency Loan. Without limiting the foregoing, Agent shall not be liable as principal for the performance of an Agency Loan, but this is without prejudice to any liability of Agent under any other provision of this Annex; and

(b)    all the provisions of the Agreement shall apply separately as between Borrower and each Principal for whom the Agent has entered into an Agency Loan or Agency Loans as if each such Principal were a party to a separate agreement with Borrower in all respects identical with this Agreement other than this Annex and as if the Principal were Lender in respect of that agreement; provided that

(i)    if there occurs in relation to the Agent an Event of Default or an event which would constitute an Event of Default if Borrower served written notice under any sub clause of paragraph 10 of the Agreement, Borrower shall be entitled by giving written notice to the Principal (which notice shall be validly given if given in accordance with paragraph 20 of the Agreement) to declare that by reason of that event an Event of Default is to be treated as occurring in relation to the Principal.  If Borrower gives such a notice then an Event of Default shall be treated as occurring in relation to the Principal at the time when the notice is deemed to be given; and

(ii)    if the Principal is neither incorporated in nor has established a place of business in Great Britain, the Principal shall for the purposes of the agreement referred to

in paragraph 1.5(b) above be deemed to have appointed as its agent to receive on its behalf service of process in the courts of England the Agent, or if the Agent is neither incorporated nor has established a place of business in Great Britain, the person appointed by the Agent for the purposes of this Agreement, or such other person as the Principal may from time to time specify in a written notice given to the other Party.

If Lender has indicated in paragraph 6 of the Schedule that it may enter into Loans as agent, the foregoing provisions of this paragraph do not affect the operation of the Agreement as between Borrower and Lender in respect of any Loans into which Lender may enter on its own account as principal.

1.6     **Warranty of authority by Lender acting as Agent**

Agent warrants to Borrower that it will, on every occasion on which it enters or purports to enter into a Loan as an Agency Loan, have been duly authorised to enter into that Loan and perform the obligations arising under such Loan on behalf of the Principal in respect of that Loan and to perform on behalf of the Principal all the obligations of that person under the agreement referred to in paragraph 1.5(b) above.

78YORK00000813

## ADDENDUM FOR POOLED PRINCIPAL AGENCY LOANS

**1.    SCOPE**

This addendum applies where the Agent wishes to enter into an Agency Loan on behalf of more than one Principal.  The Agency Annex shall apply to such a Loan subject to the modifications and additional terms and conditions contained in paragraph 2 to 7 below.

**2.    INTERPRETATION**

2.1    In this addendum:

(a)    *Collateral Transfer* has the meaning given in paragraph 5.1 below;

(b)    if at any time on any Business Day the aggregate Market Value of Posted Collateral in respect of all Agency Loans outstanding with a Principal under the Agreement exceeds the aggregate of the Required Collateral Value in respect of such Agency Loans, Borrower has a *Net Loan Exposure* to that Principal equal to that excess; if at any time on any Business Day the aggregate Market Value of Posted Collateral in respect of all Agency Loans outstanding under the Agreement with a Principal falls below the aggregate of the Required Collateral Value in respect of such Agency Loans, that Principal has a *Net Loan Exposure* to Borrower for such Agency Loans equal to that deficiency;

(c)    *Pooled Principal* has the meaning given in paragraph 6(a) below; and

(d)    *Pooled Loan* has the meaning given in paragraph 6(a) below.

**3.    MODIFICATIONS TO THE AGENCY ANNEX**

3.1    Paragraph 1.3(b) of the Agency Annex is deleted and replaced by the following:

"it enters into that Loan on behalf of one or more Principals and at or before the time when it enters into the Loan it discloses to Borrower the identity and the jurisdiction of incorporation, organisation or establishment of each such Principal (and such disclosure may be made either directly or by reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal);".

3.2    Paragraph 1.3(c) of the Agency Annex is deleted and replaced by the following:

"it has at the time when the Loan is entered into actual authority to enter into the Loan on behalf of each Principal and to perform on behalf of each Principal all of that Principal's obligations under the Agreement".

**4.    ALLOCATION OF AGENCY LOANS**

4.1    The Agent undertakes that if, at the time of entering into an Agency Loan, the Agent has not allocated the Loan to a Principal, it will allocate the Loan before the Settlement Date for that Agency Loan either to a single Principal or to several Principals, each of whom shall be responsible for only that part of the Agency Loan which has been allocated to it.

78YORK00000814

Promptly following such allocation, the Agent shall notify Borrower of the Principal or Principals (whether by name or reference to a code or identifier which the Parties have agreed will be used to refer to a specified Principal) to which that Loan or part of that Loan has been allocated.

4.2    Upon allocation of a Loan in accordance with paragraph 4.1 above or otherwise, with effect from the date on which the Loan was entered into:

(a)    where the allocation is to a single Principal, the Loan shall be deemed to have been entered into between Borrower and that Principal; and

(b)    where the allocation is to two or more Principals, a separate Loan shall be deemed to have been entered into between Borrower and each such Principal with respect to the appropriate proportion of the Loan.

4.3    If the Agent shall fail to perform its obligations under paragraph 4.2 above then for the purposes of assessing any damage suffered by Borrower (but for no other purpose) it shall be assumed that, if the Loan concerned (to the extent not allocated) had been allocated in accordance with that paragraph, all the terms of the Loan would have been duly performed.

**5.    ALLOCATION OF COLLATERAL**

5.1    Unless the Agent expressly allocates (a) a deposit or delivery of Posted Collateral or (b) a repayment of Cash Collateral or a redelivery of Equivalent Collateral (each a Collateral Transfer) before such time, the Agent shall, at the time of making or receiving that Collateral Transfer, be deemed to have allocated any Collateral Transfer in accordance with paragraph 6.3 below.

5.2    (a)    If the Agent has made a Collateral Transfer on behalf of more than one Pooled Principal, that Collateral Transfer shall be allocated in proportion to Borrower's Net Loan Exposure in respect of each Pooled Principal at the Agent's close of business on the Business Day before the Collateral Transfer is made; and

(b)    if the Agent has received a Collateral Transfer on behalf of more than one Pooled Principal, that Collateral Transfer shall be allocated in proportion to each Pooled Principal's Net Loan Exposure in respect of Borrower at the Agent's close of business on the Business Day before the Collateral Transfer is made.

(c)    Sub paragraphs (a) and (b) shall not apply in respect of any Collateral Transfer which is effected or deemed to have been effected under paragraph 6.3 below.

**6.    POOLED PRINCIPALS:  REBALANCING OF MARGIN**

6.1    Where the Agent acts on behalf of more than one Principal, the Parties may agree that, as regards all (but not some only) outstanding Agency Loans with those Principals, or with such of those Principals as they may agree (*Pooled Principals*, such Agency Loans being *Pooled Loans*), any Collateral Transfers are to be made on an aggregate net basis.

78YORK00000815

6.2    Paragraphs 6.3 to 6.5 below shall have effect for the purpose of ensuring that Posted Collateral is, so far as is practicable, transferred and held uniformly, as between the respective Pooled Principals, in respect of all Pooled Loans for the time being outstanding under the Agreement.

6.3    At or as soon as practicable after the Agent's close of business on each Business Day on which Pooled Loans are outstanding (or at such other times as the Parties may from time to time agree) there shall be effected such Collateral Transfers as shall ensure that immediately thereafter:

(a)    in respect of all Pooled Principals which have a Net Loan Exposure to Borrower, the amount of Collateral then deliverable or Cash Collateral then payable by Borrower to each such Pooled Principal is equal to such proportion of the aggregate amount of Collateral then deliverable or Cash Collateral then payable, to all such Pooled Principals as corresponds to the proportion which the Net Loan Exposure of the relevant Pooled Principal bears to the aggregate of the Net Loan Exposures of all Pooled Principals to Borrower; and

(b)    in respect of all Pooled Principals to which Borrower has a Net Loan Exposure, the aggregate amount of Equivalent Collateral then deliverable or repayable by each such Pooled Principal to Borrower is equal to such proportion of the aggregate amount of Equivalent Collateral then deliverable or repayable by all such Pooled Principals as corresponds to the proportion which the Net Loan Exposure of Borrower to the relevant Pooled Principal bears to the aggregate of the Net Loan Exposures of Borrower to all Pooled Principals.

6.4    Collateral Transfers effected under paragraph 6.3 shall be effected (and if not so effected shall be deemed to have been so effected) by appropriations made by the Agent and shall be reflected by entries in accounting and other records maintained by the Agent.  Accordingly, it shall not be necessary for payments of cash or deliveries of Securities to be made through any settlement system for the purpose of such Collateral Transfers.  Without limiting the generality of the foregoing, the Agent is hereby authorised and instructed by Borrower to do all such things on behalf of Borrower as may be necessary or expedient to effect and record the receipt on behalf of Borrower of cash and Securities from, and the delivery on behalf of Borrower of cash and Securities to, Pooled Principals in the course or for the purposes of any Collateral Transfer effected under that paragraph.

6.5    Promptly following the Collateral Transfers effected under paragraph 6.3 above, and as at the Agent's close of business on any Business Day, the Agent shall prepare a statement showing in respect of each Pooled Principal the amount of cash Collateral which has been paid, and the amount of non-cash Collateral of each description which have been transferred, by or to that Pooled Principal immediately after those Collateral Transfers.  If Borrower so requests, the Agent shall deliver to Borrower a copy of the statement so prepared in a format and to a timetable generally used in the market.

7.    **WARRANTIES**

7.1    The Agent warrants to Borrower that:

78YORK00000816

(a)    all notifications provided to Borrower under paragraph 4.1 above and all statements provided to the other party under paragraph 6.5 above shall be complete and accurate in all material respects;

(b)    at the time of allocating an Agency Loan in accordance with paragraph 4.1 above, each Principal or Principals to whom the Agent has allocated that Agency Loan or any part of that Agency Loan is duly authorised to enter into the Agency Loans contemplated by this Agreement and to perform its obligations thereunder; and

(c)    at the time of allocating an Agency Loan in accordance with paragraph 4.1 above, no Event of Default or event which would constitute an Event of Default with the service of a Default Notice or other written notice under paragraph 14 of the Agreement has occurred in relation to any Principal or Principals to whom the Agent has allocated that Agency Loan or any part of that Agency Loan.